L.L. K.L. Miners by K.L. against Evesham Township Board of Education. Mr. Daly. Please record. Michael Daly of Westmont on behalf of the plaintiffs. I'd like to reserve three minutes for rebuttal. Thank you. This case I suggest involves two main issues. One is did the district court weigh evidence and make determinations that should have been left for a jury? And two, did the district court in performing the prima facie case analysis, was it too inflexible and said that the plaintiffs could not establish the final prong of the prima facie case because they could not identify comparators? Mr. Daly, I think this is consistent with what you just indicated of the issues. Very bottom line, at least from my standpoint, you needed to show and need to show here for purposes of the issues you've set forth that there was some evidence of racial discrimination to support these various claims. There is a litany of factual allegations that we have certainly and necessarily reviewed. But ultimately, and this is of course what the district court would have determined, what was lacking, according to the district court, was sufficient evidence that what happened with respect to K.L. and L.L. may indeed have happened, but that there was no racial animus behind it. Then what was before the district court that would have justified a reasonable inference of racial animus visited upon either or both of these children? Well, towards the end, we had the comment of we know that the neighborhood we're in was dealing with you. Isn't that comment by, that was what, the assistant principal or the principal made that statement to L.L.? No, K.L. Was it to K.L.? K.L., the father, yes. Isn't that just as susceptible to another inference that he was using neighborhood in a figurative sense, that is to demarcate the area of conversation? I agree that it's susceptible to another inference, but it is my understanding that even where the facts are undisputed, that if there are two inferences that can be drawn from a statement or conduct or some fact, that in a motion for summary judgment, the inference that favors the party opposing the motion is the one that the court has to draw. If you have, if there's two choices between we can infer this from that or we can infer that from that, the court has to draw the inference that would be favorable to the party opposing the motion for summary judgment. Factual issues can be where one party says ABC happened and the other party says XYZ happened, but factual disputes can also occur where the parties agree that ABC occurred, but that the inferences to be drawn from ABC are different. And as long as there's a reasonable basis for the inference that would support the opponent's position, then the court has to make the inference in favor of the party opposing the motion. You said that the district court applied a standard that was too inflexible, saying that didn't show, and this is my reading of the district court opinion, the reason that he dismissed the claims were because they didn't show that they were treated differently from others. Now, even under that standard, I think there's declarations that do aver that they were treated differently, but what standard should have been applied? You look at the whole circumstances, which would include the hostility that was experienced. You look at, you have on this continuum of events, on the shoulders of that, at the beginning, is the incident of the reporting to the child welfare authorities. Now, of course, the district says, well, we had a factual basis to do it and we were duty bound. The plaintiff's position is, well, we have provided information that the information they claim they received, they never received, hence they made it up and reported it. But didn't the boy testify in his deposition that he had told the teachers that his father poured water on his head? My recollection of that testimony was that it was somewhat ambiguous and that the specific statements made in the certification were not. Where's the ambiguity? It seems to me having water poured on your head is a pretty stark episode. How can that be ambiguous? Well, I guess as to the specificity of it, but I'll accept, yes, I would have to agree with you on that. However, I believe that really wasn't the thrust. The reporting was these kids are being endangered because there's evidence that they're being hit and things much more serious than that. So, I mean, if you're taking and you're reporting a bag full of reasons which are very serious and there's one of this water thing, like where did the others come from? I couldn't figure out exactly what your retaliation claim was. It's not really set forth specifically. What was the retaliatory conduct for what protected activity? Well, the initial, the reporting, the argument is, occurred after the father had gone to the school and said that I feel my children are being treated differently on a calendar. So it was the child abuse reporting that retaliatory conduct? With temporal proximity, the child reporting incident occurred. Well, that was three months later, wasn't it? It might have been two months, but three months I don't think takes it out of temporal proximity. I mean, there's cases under the federal whistleblowing statute that say adverse actions that occur up to two years after the whistleblowing have temporal proximity. So I think that's a little strained, but I don't think three months passes it out of temporal proximity. So how would you have satisfied the proper standard, a more flexible standard that you say should have been applied? You look at the hostility. You look that there is evidence that there was disparate treatment. You look that there were incidents that occurred. Excuse me. What is the evidence of disparate treatment here? I mean, I understand there are allegations that Hale and Heller were treated differently. What were the differences? What is in the record to demonstrate similar episodes where, I presume, a white student was apparently not subjected to the same sort of treatment? What are some of those examples, some of those comparisons? Being called stupid in front of the class and it was never observed that a white student had been subjected to that kind of public humiliation by the teacher or that kind of humiliation in front of their peers. The fact that the one student used the N-word. What control does the school district have over another student using an offensive term like that? Well, they have control in the sense that they can discipline the student who did it. Do you know that it did not occur here? Yet, there is nothing in the record to show that they disciplined the student. The statement was that this is something that we don't really have to do something about because it wasn't directed to your daughter. Well, if you speak in an audible fashion the N-word, and there is only one person of color within the hearing range of that, I think it's pretty hard to deny that there wasn't some kind of intention there on account of race. Well, no, that wasn't my question. My question had to do with who is responsible for that. My understanding of your claim is that a student uttered that word, not a teacher, principal, or administrator. And then the district took no effective remedial action to deal with that situation. Instead, they said, well, it wasn't directed to your daughter. Do we know how many African-American children there were in these classes? I believe from the record, apparently these plaintiffs are the only African-American children in these classes. That is in the record? Yeah, which is part of the situation with the comparators. Like, well, it's not like we can say other African-American children were also treated this way, which is another way you can show disparity treatment, people of the same protected class being treated differently than people outside the protected class. There's a declaration at 531, 533 that L.L. gives and does say I was treated differently. But then there were depositions that were taken. And a lot of the depositions on both sides were I don't remember, I don't remember, I don't remember. Can you point to anything specific by these plaintiffs where they were deposed and cited specific instances? Well, I believe that, and I put it in the brief, about the incident with the fingers, where the explanation on the fingers was the student pushing the desk? Yes. Yes, and caught the fingers. And the explanation by the district was, oh, it was an accident, and the deposition testimony was that it wasn't an accident because after he did it, he didn't apologize. He looked at me, and he laughed, and the teacher was watching. But there's also nothing in the record that suggests a prior bad relationship of any kind between these two, that there had been difficulties of any kind between these two students, right? I don't believe between those two students, but there was a history, and these students were in the same classes, where it sort of like was revolving in sort of a situation of kids, you know, one after the other, getting involved. All right, Mr. Daly, thank you. Your time's up, and we'll have you back on rebuttal. Thank you. Mr. Cohen. Your Honor, I think Judge Smith, you hit it, you nailed it right on the head. What was lacking here was sufficient evidence to show that any of the events that they point to were racially motivated. But that's not what the district court held. The district court said the claims, discrimination claims, failed because they failed to show that they were treated differently from Caucasian students. Right, and I would suggest that that's an inferring of essentially the same test. Well, I mean, isn't that a form of evidence that is used to demonstrate that there is racial animus? That is, compared to or simply an evidentiary form of showing, by circumstantial evidence, that there is some racial discrimination. Absolutely, and I think even if you think about it philosophically, the McDonnell-Douglas test is… But we're not there. I'm sorry? We're not there. It didn't get past the prima facie test. Oh, no, no, no, no. What I'm saying, though, is that if you look philosophically at the McDonnell-Douglas test, what it's basically recognizing is that there's going to be legitimate reasons why the same exact action could happen to the same exact person. We don't care, we the law, don't care if someone is a bad teacher. We care if they're a discriminatory teacher. And that distinction is clear, I think, not only in this context, but especially in the employment context. Well, we've also always recognized in the area of racial discrimination that proof can be a very, very difficult thing because people will not admit to racial animus, and also, very importantly, because it may manifest itself in ways that are not susceptible to the demonstration of direct evidence. So we need circumstantial evidence to show it. Comparators are one, but Judge Rundell wrote a very excellent opinion some years ago in Anderson v. Wachovia that says you don't have to have, it says in part you don't have to have comparators as evidence. There are certainly other ways available to prove that there is racial animus present. So here, with two African-American students apparently being the only students among an otherwise white student population, we need to look at the various episodes that have been proffered here and determine whether each, several, all of them are susceptible to some kind of inference that racial discrimination or racial animus was behind them. I'm struggling, frankly, to find many here that give rise to any such inference, but there are a number of them that Mr. Daly has suggested, despite competing inferences, might be suggestive of a racial basis behind them. Do you not concede that, for example, the N-word example that he's provided, what about that? Well, what I would say about that is let's look at the testimony and let's look at what the child said. And counsel said, was speaking about that this happened to the daughter. In fact, it happened to the son, K. L. Jr. And essentially what his testimony was, was that the other child looked back at him, said the word, and turned back towards the front. The teacher looked at him, smiled, and walked out. And from that, they try to create an inference that there was racial animus on behalf of the defendants. Now, you could say, obviously, the child, you know, if he had a concept of what was happening. Wasn't the allegation factually more than that, though, that the teacher walked out, was overheard to talk with another teacher, and that there seemed to be some acceptance of what had just happened? If you read the entirety of the child's deposition, at the end his own attorney wanted to clarify that point. And he said, did you hear the N-word again when the teachers were in the hallway? And he said, no. So basically, the teacher walked into the hallway, had a conversation apparently with another teacher, and laughed. But we don't know anything more than that. From that, they're saying, well, that's evidence that, you know, there was some acceptance of the word by the teacher. The other point, and, you know, he emphasized in his argument that, you know, there was never any discipline on this child. Well, they didn't raise this allegation until this litigation. So this wasn't a situation where the child said this word, and then K.L. went home, told his parents. His parents brought it to the attention of the school, or the child immediately went to the principal. There was plenty of that. There was plenty of that. There were a lot of issues. And if you look at what happened. They didn't do it in one instance, but they did it in five instances. And they investigated. And they investigated. And where appropriate, they disciplined the other children. There was a situation where there was a fight in the bathroom. There was the incident where L.L. was chased around the schoolyard. You know, they took these. And, in fact, when she made the allegation against her gym teacher, that her gym teacher made inappropriate, you know, lifted her shirt or whatever the allegation was, in fact, the police got involved. And it wasn't until that they confirmed the teacher's story with the video, by observing the video. I mean, that's how far these investigations went. These things were taken very, very seriously. So what you essentially have is a situation where, in a school, there is going to be a number of incidents that happen. You're dealing with elementary school children. There's going to be conflicts between them. I guess the sheer volume and the fact that a few do look pointedly or could be taken to be discriminatory reminds me of a case that we had several years ago where there were numerous instances that could have been viewed as anti-Semitic. And the district court analysis was, this one isn't, this one isn't, this one isn't, this one isn't. But you put them all together, something more is going on here. And I guess the question is, rarely do we see something thrown out at the prima facie case. Very, very rarely. In fact, we get to McDonnell Douglas, and maybe we want to find out the legitimacy of the reasons, or maybe there's something going on here that we don't know. And I guess my question is, why shouldn't this be aired in that situation, given the fact that there are some instances here that would raise questions? Well, ultimately, I would come down to just simply the fact that there are no comparators. Well, no, but there's a declaration that says no one else, no white children were treated that way. It says here, but the teacher didn't yell at them for doing so. When the Caucasians asked to use the bathroom, they also permitted them to leave. Mrs. Watson didn't yell at any of the Caucasian students. Well, you can't create a, you can't say, okay, didn't do this to these 16 people who happen to be white. I mean, there are, according to the district court's test, that didn't say this happened to others. I mean, that seems to me to be wrong. Well, because I think that what you also have to look at. Is that wrong? Was the district court wrong, or am I wrong in reading the declaration? No, I think the district court was wrong at all, because I think what the district court is saying here is not only that there has to be comparators, but we also have to know whether somebody is treated or not. To say that, you know, another student wasn't permitted to do that, number one, you're only dealing with the AFIIM's personal knowledge. You don't know whether there was other students who got the same exact punishment. Well, you don't know, but the allegation is. But the allegation is, and at this stage, it's their obligation to go beyond merely the allegation. Well, it's a declaration which I assume is taken as evidence. If not, then... Who has the burden in offering evidence of comparators? And in setting up the comparison itself. Absolutely, because it's a prima facie case. And even when we're talking about, you know, a case where there's a number of different allegations, we don't know whether or not this was part of the course for that school or not. There are some schools where, unfortunately, because of, you know, circumstances regarding the community, it may have more discipline problems than others. Well, it's true we don't know, but as I said, we're at an early stage. Well, we don't know, but it's their burden, even at this stage, to establish that. That's the comparator problem. The comparator problem is he says, okay, well, we've got two students with 18 disciplinary problems. In the same time period, perhaps every other student in the school could have had 25. Do you agree, though, that the... So this could be better behaved and got less discipline than the other kids. We just don't know. Do you agree, though, that the comparator that we have held under Pivarotto and other cases, that it's not limited to the comparator? I don't think it needs to be limited to comparators, no. But beyond that, you have to have something that absolutely shows, you know, a racial... Absolutely shows a racial... You know, that shows it. I mean, I think that when you're talking about the kind of evidence that they're presenting... You have the N-word. You have the brother versus buddy. You have the neighborhood. You have... But, okay, and I would suggest that, you know, the N-word... And the child abuse report. And the child abuse report. And if you look at the deposition testimony of both of the children, they affirmed that their parents were arguing over money. They both affirmed that the father poured cold water on the child's head. The complaint was investigated. It was investigated. It was investigated by an agency. Absolutely. Absolutely. And at that point, when you receive these allegations, it's not the school's place to do the full investigation to determine exactly what is alleged exactly. And that's why these reporting statutes exist. Because at that point, you know, you get my father is dumping water on my head and my parents are screaming at each other. You know, it's reasonably suggestive of a problem, and we report it and let the professionals come in and do it. When you talk about the statement about the N-word, when you look at the actual facts here, you know, if it was a teacher that said that... Well, the teacher's acquiescence in another child's doing that, that to me is a little problematic, really. If there was something to establish that. The allegation of the student is that the teacher looked, smiled, walked out the room. Yeah, smiled and then laughed. Is this really what... But the missing element here is he's assuming and he's speculating that she heard the statement, that she smiled because of the statement, because she approved of the statement. Well, but shouldn't... I guess you're assuming, you're looking at it one way, and I guess my point is... And I'm questioning, I don't know myself, but maybe it's something that a jury should hear instead of us saying she didn't hear it. We'll assume she didn't hear it. Okay, but I would also say, you know, when we talk about inferences, we're also talking about reasonable inferences. And here when you have speculation that she may have heard and she may have approved, I don't think that... But someone might say it's a reasonable inference that if she smiled, she heard something. Or she simply saw a child who was looking at her and she smiled. The child also said that he didn't even know what the word meant at the time, you know, which makes me question, and obviously this would be a question of fact, a question for perhaps a jury rather than, you know, the judgment and determination on this at this point as to what exactly happened there. But you can't say that simply because someone smiled that they heard and approved of something that you haven't established that they even heard. I mean, that to me is like the missing element on that point. If the evidence that they came in with was a teacher said the N-word to the child, then absolutely, yes, you know what, that is sufficient. That probably gets you past the cream of the face case. But you don't have that here, so you have to ask the question, is it a reasonable inference? When you say, you know, we know what neighborhood we're in with you, is it a reasonable inference to say that that has a racial connotation? And, frankly, I simply don't see it. At this point, there's – Well, we're supposed to, as your colleague said, we're supposed to look at the evidence, you know, pointing towards his side, not against the moving party. True, true. But the court doesn't have to accept unreasonable inferences. The court should look at the entirety of the evidence that's presented. And I think what happened here was that when there were complaints, they were investigated. The ones that were found, appropriate discipline was given, and you simply have a situation where there's nothing that connects all these events in the school to the racial discrimination claim that they're making. So unless you all just have any other questions, I'll rest on the remainder of my brief. Thank you. Mr. Daly, rebuttal. No worries. I believe Judge Becker once said that you can't evaluate a play without looking at the whole play. You just can't look at little bits of it. And as Judge Rendell indicated, that you have to look at this entire scenario in making a determination whether there is sufficient evidence of racial bias. And the standard is not. This is harassment. It's not just one incident. It's not just occasional incidents. It's got to be a pervasive situation. And do you really have that here? I believe that a reasonable fact finder could determine that. And that's the standard. The standard is not whether we absolutely prove that it was pervasive or it was offensive or whether it's hostile. It's whether a reasonable fact finder could make that kind of conclusion. And I think under this entire scenario, a reasonable fact finder could. How long a period of time did this series of events occur? I think it was almost two years. I thought it was more than that. I think maybe it was two years. You've got different claims. You've got, I mean, the counts are kind of crazy too. I didn't draw them. I know. It's not your doing. But you've got to harass. You've got a hostile environment claim. But then you separate is a plain old discrimination claim, which would not require the severe pervasive harassment. Anything further? No. Mr. Daly, thank you very much. And thank you. Thank you very much for your helpful arguments. We'll take the case under advice.